646 A.2d 1150

CHERRY HILL FIRE COMPANY NO. 1, PLAINTIFF, v. CHERRY HILL FIRE DISTRICT NO. 3, CHERRY HILL FIRE DISTRICT NO. 13 AND TOWNSHIP OF CHERRY HILL, DEFENDANTS, AND ERLTON FIRE COMPANY NO. 1, PLAINTIFF, CHERRY HILL FIRE DISTRICT NO. 13, DEFENDANT.

Superior Court of New Jersey
Chancery Division Camden County

Decided May 23, 1994.

*Sanford F. Schmidt* for plaintiff, Cherry Hill Fire Co. # 1, (*Gerstein, Cohen & Grayson,* attorneys).

*John J. Murphy* III, for plaintiff, Erlton Fire Co. # 1 (*Stradley, Ronon, Stevens & Young,* attorneys).

*Ann C. Pearl* for Cherry Hill Fire District # 3.

*Kenneth E. Meiser* for Township of Cherry Hill.

THEODORE Z. DAVIS, J.S.C.

The question these consolidated cases present is one not previously addressed by any reported decision of our courts.

The question raised is as follows: Does the consolidation, by municipal ordinance, of previously existing fire districts into one new fire district have the effect of giving such new district the power to abrogate all obligations that each dissolved district may have had with the fire companies which served their districts?

Each party avers that the facts before the court are undisputed and that the question whether the new fire district may abrogate the prior obligations of the dissolved districts is ripe for decision as a matter of law. Each party has moved for summary judgment under *R.* 4:46–2.

## BACKGROUND

On July 12, 1993, the Township Council of the Township of Cherry Hill passed Ordinance 93–27 which dissolved fire district Nos. 1, 2, 3, 4, 5, and 7 and created a new consolidated fire district to be known as "Fire District No. 13 of Cherry Hill Township, Camden County (Fire District 13)." Fire District No. 2 and No. 7 are involved in this litigation. Fire District No. 2 was served by the Erlton Fire Company No. 1 and Fire District No. 7 was served by Cherry Hill Fire Company No. 1.

**A. Cherry Hill Fire Company No. 1.** This fire company was first incorporated on January 9, 1945 pursuant to those statutory laws which preceded the present laws found in *N.J.S.A.* 15A:1–1 to 15A:16–2. The company is a nonprofit corporation operating as a voluntary fire company.

This company has exercised its powers under its charter to acquire land, build a fire house, acquire, sell and replace fire fighting trucks and other equipment. All of its real and personal property were acquired in its corporate name and have remained so for the entirety of its corporate existence. As previously mentioned, this company served District # 7 which was not creat-

ed until 1963.[1] For the past 30 years, the fire company has provided fire fighting services to District # 7 by means of written lease agreements. The latest agreement is dated January 14, 1992, and continues by its terms until December 31, 2002.

Under the terms of this lease agreement, the district was to pay the company the annual sum of $92,500.00. This payment was subject to periodic increases with a yearly cap of 20%. For the year 1993, the annual lease payment was $105,000.00. In paragraph 8 of this lease it states that it "is binding on all parties who lawfully succeed to the rights or place of the Landlord or you, the Tenant."

**B. Erlton Fire Company No. 1.** This company was formed as a non-profit corporation under New Jersey law in 1927, and its members have provided uninterrupted fire protection services to the area of the Cherry Hill community now designated Fire District 2. Over the past 66 years, this company has purchased land, constructed and most recently completely renovated the fire house known as the Erlton Firehouse. Fee simple title to these premises is in the name of the company. The acquisition of this property and the cost of improvements over the years were accomplished by various members pledging their homes and other assets for some of the loans necessary. As an example, the company borrowed $365,000 from the Bank of New Jersey in 1970 to finance the improvement and expansion of the firehouse.

Fire District No. 2 was created by ordinance dated January 23, 1950, such enactment being pursuant to the statutory predecessors of *N.J.S.A.* 40A:14–70. This district was created to cover the

---

[1] A fire district is a "body corporate", *N.J.S.A.* 40A:14–70. A fire district has been described as a "... rapidly growing type[s] of local government ..." and "... an autonomous form of government devoted solely to financing fire protection in a particular area of a municipality, thus eliminating the governing body from the annual budget process as to fire fighting and leaving each part of the municipality subject only to the members of the district governing body, who, in turn, are elected by the residents of the district...." 35 *New Jersey Practice Local Government Law*, § 450, at 253 (Pane) (2d Ed.).

area historically covered by the fire company plus the surrounding communities.

From 1950 until the present, District No. 2 leased the Erlton company's firehouse. The latest lease, which was executed after a dispute between the parties was resolved on December 13, 1992, was for an annual sum of $92,250.00. This sum was a part of the district's 1993 budget and was submitted to the voters. The voters of this district approved the budget.

This 1992 lease agreement expressly provides that it will be binding upon any successors of Fire District No. 2:

... any governmental body, township, fire district or other political subdivision, or entity of any nature whatsoever succeeding to the duties, responsibilities and/or assets of tenant as a result of such change shall automatically assume and be bound by all the liabilities and obligations of Tenant hereunder which are then outstanding or which may accrue during the remaining term of this Lease.

[Lease Agreement, paragraph 32.]

**C. Creation and operation of Fire District 13.** As previously stated, this district was created on July 12, 1993. The ordinance expressly provided for the transfer of all assets from the existing fire *districts* (emphasis supplied) to Fire District No. 13, effective January 1, 1994:

Section 7: All assets, including but not limited to, real and personal property titled in the name of Fire District Nos. 1, 2, 3, 4, 5 & 7 and all monies remaining in their treasuries shall be transferred and delivered to the new Fire District on January 1, 1994.

Section 8 of the ordinance further provides that:

Nothing contained herein shall adversely affect the repayment of the bonds and obligations, if any, of said Cherry Hill Fire District Nos. 1, 2, 3, 4, 5 & 7 as all said bonds and obligations shall be assumed or paid off by the new Fire District on January 1, 1994.

The district began serving as a "transitional entity" beginning October 4, 1993. Since that date, the new district has met on a regular basis, passed resolutions and promulgated a position paper setting forth its proposed future course of action. Under the terms of the ordinance, District 13 commenced active operations on January 1, 1994.

On November 8, 1993, while still in its "transitional" stage, the district promulgated its "POSITION STATEMENT." Notwithstanding the execution of the recent leases between District Nos. 2 and 7 and the Erlton and Cherry Hill fire companies, page three of the "Position Statement" reads in pertinent part as follows:

The Fire District shall pay a rental of $1.00 per year to Fire Companies for the use of buildings or a portion thereof needed by the District, as well as vehicles and equipment titled in their names. The Fire District will enter into contracts with Volunteer Companies for the Companies to provide fire fighting services.

The District will make capital payments and perform maintenance and repairs as needed on equipment and real estate. (Note: The District will assume payments on all equipment and real estate presently owned by volunteer companies. However, the Chief will determine how and where the equipment will be used for the protection of the Community.)

The commissioners [2] of District 13 demanded that each of the volunteer companies in Cherry Hill reapply for permission to serve as volunteer companies even though they were at that time already certified as such. Although the Erlton company did not agree that it had to reapply, it nonetheless submitted a verified petition for certification on November 16, 1993. The Cherry Hill Fire Company No. 1 also reapplied. By Resolution No. 93–11–21 the companies were certified as volunteer fire companies.

Notwithstanding their approval by ordinance as volunteer fire companies, the commissioners subsequently determined that they would not recognize these companies unless they executed leases that were to be uniform and consistent with the "Position Statement." These uniform leases were to carry an annual rental of $1.00.

## ANALYSIS

To solve the legal question raised, the district contends that the determination of whether it was engaged in a governmental function as opposed to a proprietary one should be the analytical construct for deciding the motions.

---

[2] Pursuant to *N.J.S.A.* 40A:14–70, a board of Fire Commissioners must be elected once a district is created. Elections are then conducted annually thereafter. Only the residents of the district may vote for the commissioners.

The fire companies contend that the common and statutory laws regarding successor municipal responsibility for prior contractual obligations should be the focus of the court's analysis in resolving the motions for summary judgments. The fire companies inferentially admit that what they and the districts normally do are governmental in nature and relate to the general public welfare and safety. The fire companies' approach is the better of the two.

## I

"It is true that, generally, our law favors the enforcement of contracts voluntarily made between competent parties and strongly disfavors the disavowal of contractual agreements by persons who have received and retained the benefits thereunder." *McCabe v. Kupper,* 4 *N.J.Super.* 178, 181, 66 *A.*2d 629 (App.Div. 1949). Each party admits, at least by their silence on the question, that each were competent and had the right, consistent with common and statutory laws, to voluntarily enter into the leases they executed.

It is equally true that both our federal constitution, *U.S. Const.* art. 1, § 10 and our state constitution, *N.J. Const.* (1947), art. IV, § VII, para. 3, prevent legislatures from passing any laws which impair the obligation of contracts which existed when the contract was made. Notwithstanding the source and sanctity of this pronouncement, it has been stated that:

> The constitutional interdiction against impairment of contracts is not an absolute one. *City of El Paso v. Simmons, supra,* 379 *U.S.* at [497] 508, 85 *S.Ct.* 577 [at 820, 13 *L.Ed.*2d 446 (1965)]; *N.J. Sports & Exposition Auth. v. McCrane,* 119 *N.J.Super.* 457, 563 [292 *A.*2d 580] (Law Div.1971), *mod.* 61 *N.J.* 1 [292 *A.*2d 545] (1972). Every contract is made subject to the condition that its fulfillment may be frustrated by a *proper exercise of the police power. Veix v. Seneca B. & L. Ass'n,* 126 *N.J.L.* 314, 320 [19 *A.*2d 219] (E. & A.1941); *American Budget Corp. v. Furman,* 67 *N.J.Super.* 134, 144, [170 *A.*2d 63] (Ch.Div.1961), aff'd 36 *N.J.* 129 [175 *A.*2d 622] (1961). (Emphasis supplied).
>
> [*Albigese v. City of Jersey City,* 127 *N.J.Super.* 101, 316 *A.*2d 483, (Law Div.1974).]

Before determining whether the conduct of District 13 is a proper exercise of their "police power", the court should examine

all statutes pertaining to the creation and dissolution of public bodies, including fire districts.

■ It is a well known and long standing principle in New Jersey that a corporation "having taken over the assets of the former company for the purpose of carrying on its business, without apparent change in the personnel of the concern, is liable for the payment of the debts of the former concern. It is held to take the benefits and advantages *cum onere.*" *Parsons Mfg. Co. v. Hamilton Ice Mfg. Co.*, 78 *N.J.L.* 309, 312, 73 *A.* 254 (Sup.Ct. 1909).

The New Jersey legislature has enacted statutes which codify the above pronouncement with regard to corporations for profit, *N.J.S.A.* 14A:10-6, and non-profit corporations, *N.J.S.A.* 15A:10-6. The language in each is identical. Since this matter involves entities which are not for profit, that statute in relevant part shall be stated.

When a merger or consolidation has become effective: ...

(b) The separate existence of all parties to the plan of merger or consolidation, except the surviving or new corporation, shall cease.

(c) Such surviving or new corporation shall, to the extent consistent with its certificate of incorporation as amended or established by the merger or consolidation, possess all the rights, privileges, powers, immunities, purposes and franchises, both public and private, of each of the merging or consolidating corporations.

(d) All real property and personal property, tangible and intangible, of every kind and description, belonging to each of the corporations so merged or consolidated shall be vested in the surviving or new corporation without further act or deed; and the title to any real estate, or any interest therein, vested in any of such corporations shall not revert or be in any way impaired by reason of such merger or consolidation.

(e) The surviving or new corporation *shall be liable for all the obligations and liabilities of each of the corporations so merged or consolidated;* and any claim existing or action or proceeding pending by or against any of such corporations may be enforced as if such merger or consolidation had not taken place. Neither the rights of creditors nor any liens upon, or security interests in, the property of any of such corporation shall be impaired by such merger or consolidation. (Emphasis supplied.)

Not only has the New Jersey Legislature dictated that profit and non-profit corporations not use mergers and consolidations as a means of escaping existing debts or liabilities, it has also insisted

that municipal corporations honor the contractual obligations and liabilities of their predecessors in the event of consolidation by merger or dissolution. The relevant statute states:

*N.J.S.A.* **40:43–64.3. Transfer of property and rights to township; liabilities; offices; adjustments.**

In any such case of annexation and consolidation:

(a) all of the property, tangible and intangible, and all the rights of any kind of the borough shall be transferred to and become the property and rights of the township ...

(c) *all liabilities,* except as are released, as provided in this Act, of the borough *shall be assumed by and shall become the liabilities of the township.* (Emphasis supplied.)

■ The act releases a consolidating borough from liability to a county for delinquent taxes in certain instances. *N.J.S.A.* 40:43–64.2. It appears that, otherwise, the consolidating borough remains responsible for the ordinary debts and liabilities of its predecessors.

This same legislative theory may be found in the statute relating to municipal dissolutions:

*N.J.S.A.* **40:43–22. Dissolution of municipality.**

Whenever any municipality shall be dissolved under any special or general law, and shall then become or be made a part of any other municipality, or shall have its territory divided among several municipalities, the municipalities of which it becomes a part, if it becomes a part of any one municipality, shall have and possess all its property, assets and liens, *and shall be bound by and charged with the payment of all its indebtedness or obligations for the payment of money, or otherwise.* Where the municipality becomes a part of, or its territory is divided among several municipalities, apportionment shall be made of said assets, property, liens, debts, obligations and other liabilities, in the manner hereinbefore provided in the case of the creation of a new municipality. (Emphasis supplied.)

New Jersey's legislative scheme, as expressed above, and which requires the obligations of prior municipal bodies not be abrogated by dissolution or consolidation, reflects the prevailing general policy throughout the United States:

Where the legislature of a state repeals the charter of a municipal corporation, dissolves the corporation, incorporates substantially the same people as a municipal body under a new name for the same general purpose, and the great mass of the taxable property of the old corporation is included within the limits of the new, and the property of the old corporation used for public purposes is transferred without consideration to the new corporation for the same public uses, *the latter, notwith-*

> standing a great reduction of its corporate limits is the successor in law of the former and liable for its debts and if any part of the creditors of the old corporation are left without provision for the payment of their claims, they can enforce satisfaction out of the new.
>
> [56 *Am.Jur.2d Municipal Corporations* § 92 (1971) (emphasis supplied).]

■ It is now apparent that our legislative scheme regarding successor municipal responsibility imposes an obligation upon the new entity to absorb the legal obligations of its predecessors. But in light of the district's insistence that it should not be responsible for the obligations that the dissolved districts had with the fire companies, there arises the question as to whether there is something very peculiar about fire districts which would exempt them from the stated national and state policy expressed above.

Unquestionably, District 13 is a public corporation formed pursuant to *N.J.S.A.* 40A:14–70. It is undisputed that several fire districts were dissolved by way of merger into District 13. There exists, however, a specific statute regarding the dissolution of fire districts; therefore, it is necessary to refer to it to determine whether its language expressly or by necessary implication exempts fire districts from what has been described as the state policy regarding successor responsibility of municipal entities.

*N.J.S.A.* 40A:14–91. **Dissolution of fire district.**

Upon a written application therefor, of at least 5% of the registered voters or twenty legal voters, whichever is the greater, the governing body of the municipality, wherein the fire district is located, shall consider the dissolution of the fire district. . . .

After the hearing the governing body of said municipality shall determine the question of the proposed dissolution.

If a resolution be adopted that the fire district be dissolved, any moneys remaining in the fire district treasury shall be disposed of as the said governing body shall direct.

This chapter and section addresses dissolution, but does not discuss the assumption of liabilities. Because it does not address assumption of liabilities, District 13 looked no further and directed its attention to recent case law. However, section 94 of the same title does speak to the abolition of fire districts and the apportionment of assets and liabilities.

> A fire district shall be deemed abolished when the municipality in which it is located shall be divided and formed into or become part of 2 or more new municipalities.
>
> Upon such abolition the governing bodies of the new municipalities and the treasurer or custodian of the funds of said fire district shall meet at a time and place to be designated by the clerk of the new municipality wherein the fire district or greater part thereof is located.... At the meeting the property of the fire district shall be apportioned between or among said new municipalities in proportion to the aggregate value of the buildings and contents of such fire district located respectively therein as ascertained from the last assessment for said fire district.
>
> A written report of such apportionment, signed by the members of the governing bodies present at said meeting, shall be made. The report shall set forth the current assets and liabilities and the division of the money and property of the fire district. *The taxpayers of the respective new municipalities shall be liable to pay their proportion of the debts, if any, of said fire district.*
>
> [*N.J.S.A.* 40A:14–94 (emphasis supplied).]

Again, the consistent legislative policy of requiring the assumption of debts is seen in this title which specifically relates to fire districts. It is recognized that this statute relates to the abolition of a municipality and the impact of such upon a fire district, and that the case before the court does not involve the abolition of Cherry Hill Township; however, the distinction is not significant, since Cherry Hill Township has caused the abolition of fire districts which have previously incurred liabilities. If Cherry Hill had dissolved all the districts, as it did, and did not create another, then this statute would have required the taxpayers of Cherry Hill to pay the outstanding liabilities. Therefore, at a minimum, the statute evidences a continuation of the legislative policy already addressed.

It is undisputed that District 13 is the successor to the districts dissolved by Ordinance 93–27. Further, it is undisputed that District 13 serves the *same* territory as its predecessors, has the *same* taxable property as its predecessors, serves the *same* functions as its predecessors and, most importantly, it received all of the assets of its predecessors without providing any consideration whatsoever for these assets. These sets of circumstances track with precision the national and state policy as expressed in 56 *Am.Jur.2d Municipal Corporations* § 92 (1971):

The foundation on which rests the liability of the new municipal corporation for the debts of the old is that the new corporation *embraces the same territory, the same corporators, and the same taxable property, has received the property of the old corporation without consideration,* and hence must bear the burdens of the old corporation in exchange for these benefits. It is presumed in every such case that the legislature intended that the liabilities as well as the rights of the property and the corporation which thereby ceases to exist shall accompany the territory and property into the jurisdiction into which the territory is annexed. Thus, if a municipal corporation goes out of existence by being annexed to, or merged in, another corporation, and if no legislative provision is made respecting the property and liabilities of the corporation which ceases to exist, the corporation to which it is merged, is entitled to all its property and is answerable for all its liabilities. (Emphasis supplied.)

Notwithstanding the clear expressions of legislative policy on the question before the court, District 13 still insists that it may avoid responsibility for the leases the dissolved districts had with the plaintiff fire companies. As support for their desire to escape from the stated policy of the state, it relies upon *Stone v. Old Bridge Tp.,* 111 *N.J.* 110, 543 *A.*2d 431 (1988). A few references to specific portions of *Stone* will clearly indicate the narrowness of the issue that confronted the Court and will show that, to a large extent, it is inapposite to the question before this court.

In this case, the narrow controversy involves the continuing enforceability of a fixed-term employment contract covering the position of Executive Director of a municipal utilities authority. The Court is asked to determine whether such an employment contract, entered into by a local utilities authority, remains valid and enforceable following the dissolution of that authority and another local utilities authority created to perform the combined functions of the dissolved authorities. In these circumstances, we conclude that under the statutory provisions by which the contracting authority was dissolved, the successor authority was not required to assume the employment contract of the predecessor authority and that the decision to terminate such an employment contract was not an abuse of discretion. *Id.* at 112, 543 *A.*2d 431.

. . . . . . . .

A public employment arrangement or contract undertaken by a governmental entity is not similar to the contractual debts incurred in the course of conducting government business. *Public employment* engenders materially different consideration from those surrounding *public contracting.* "Historically, traditionally, and as a matter of continuing currency, the subjects of municipal employment and municipal contracting have been and continue to be separate and distinct headings of municipal law." *Fennimore v. Clementon Sewerage Auth.,* 173 *N.J.Super.* 466, 470 [414 *A.*2d 593] (App.Div.1970). Such is the case with the statute dealt with today. In the context of this case we are concerned with the statutory authority of

local government entities to employ managerial personnel in the discharge of their governmental responsibilities. *This is a concern quite different from incurring contractual indebtedness.*

[*Id.* at 121, 543 *A.*2d 431 (emphasis supplied).]

In declining to enforce the employment contract, the Court went on to conclude that it is "not compatible with the basic aim of the Fiscal Law to make new authorities assume all of the employment contracts of their dissolved predecessors without regard to their own need to retain such employees." *Stone, supra,* at 120, 543 *A.*2d 431.

Because *Stone* directed its attention to the Fiscal Law to determine the authority of the local governing body to abrogate the employment contract, District 13 directs this court's attention to the Fiscal Law, since Cherry Hill's resolution dissolving the old districts and creating District 13 had to receive the approval of the Local Finance Board of the Division of Local Government Services, Department of Community Affairs, pursuant to the Local Authorities Fiscal Control Law, *N.J.S.A.* 40A:5A–1 to –27.

The fire companies do not dispute that the township had to have the approval of the Local Finance Board in order to adopt its ordinance which dissolved the old districts. Neither do they dispute that by approving the ordinance, inferentially at least, the Local Finance Board determined that the township's resolution made adequate provision for the payment of all districts' creditors or obligees. The language of *N.J.S.A.* 40A:5A–20 sets forth the procedure for dissolution of an authority by a local unit as follows:

The Local Finance Board shall approve the dissolution if it finds that the ordinance or resolution makes adequate provision in accordance with a bond resolution or otherwise for the payment of *all creditors* or obligees of the authority and that adequate provision is made for the assumption of those services provided by the authority which are necessary for the health, safety and welfare of the recipients of those services.... In the event that an authority has obligations outstanding at the time of the taking effect of the ordinance or resolution to dissolve the authority, the local unit or units dissolving the authority are authorized to issue obligations in furtherance of the dissolution, and the obligations shall have a period of usefulness not exceeding 40 years from the date of issuance. (Emphasis supplied.)

District 13 contends that since Section 8 of the resolution of the township indicates only an assumption of bonds and obligations,

and because of the interpretation given the words "bonds and obligations" in *Stone*, leases do not fall in this category and therefore, may be abrogated. If one were to limit himself to just that portion of *Stone* which dealt with the nature of obligations referred to by the Fiscal Law, one would readily conclude that leases were not covered. However, when that portion of Section 20, quoted above, which states, "[t]he Local Finance Board shall approve the dissolution if it finds that the ordinance or resolution make adequate provision in accordance with a bond resolution or otherwise for the payment of *all creditors* ..." is coupled with the limitation of *Stone* to employment contracts, this court is compelled to conclude that *Stone* can not be read as overruling a complete body of law so well established without it definitively stating so. (Emphasis supplied.) This, *Stone* did not do. Additionally, no evidence has been submitted by the district to show that when the approval of the Local Finance Board was given, Cherry Hill Township had informed such Board that it intended to abrogate all legal obligations referable to outstanding leases the proposed dissolved districts had with various fire companies. Absent such fact, it is entirely permissible for this court to conclude that the Local Finance Board was of the opinion that the Township was prepared to honor the obligations of *all creditors*. This conclusion would be and is consistent with the longstanding policy of requiring municipal entities, which are successors, to undertake and be responsible for its predecessor's liabilities. Thus, the obligations created by the leases shall subsist unless other proofs are available to drive this court to a contrary conclusion.

In addition to *Stone*, which this court has just determined as inapposite to the case presently before the court, District 13 asks this court to consider the holding of *The City of Somers Point v. Somers Point Volunteer Fire Co. No. 1 and Somers Point Volunteer Fire Co. No. 2*, (Law Div.1982). This decision has not been approved for publication. Additionally, the factual pattern and circumstances therein are far removed from those before this court. *See R.* 1:36–3. In *Somers Point*, there were no leases

sought to be abrogated. The property that the fire companies had, such as fire houses and equipment, were diverted and used in other municipalities and the companies, because of conflicts with the city administration, refused to fight fires within the geographical boundaries of Somers Point and refused to allow the fire apparatus to be stored in their fire houses. The *Somers Point* court constructed a trust on the basis that since a significant portion of the monies received by the fire companies was received from the public with which they acquired the fire houses and equipment, it would be manifestly unjust for them to withhold the use of such property from the people. There are no facts alleged by District 13 or submitted by the fire companies which remotely suggest a parallel. District 13 requests that this court adopt *Stone* which it believes permits it to abrogate its obligations under the lease, unilaterally create new terms, take the property of the fire companies and otherwise forget any and all constitutional principles, both state and federal, regarding the taking of property; all under the general assertion that the township is protecting the health and safety of its citizens. The factual pattern before this court does not require the court to address such a proposition and *Stone* does not suggest it.

It is a totally unacceptable legal proposition, as suggested by the district, that this court could divest the fire companies of their real and personal property simply because the voters in each district pay taxes to support their budgets, which budgets have as some of their line items, expenses for the operation of firehouses and equipment. Clearly, taxes often times create the revenues which governments disburse to private citizens who in turn provide services or property to the government. Just because the monies government pays to private citizens may be used by them to acquire assets to conduct their businesses does not give the government any claim or right to such acquired property. The same conclusion would be applicable to municipal corporations.

██ This court recognizes that the constitutional interdiction against impairment of contracts is not an absolute one, *City of El*

*Paso v. Simmons,* 379 *U.S.* at 508, 85 *S.Ct.* at 583, and that every contract is made subject to the condition that its fulfillment may be frustrated by a proper exercise of the police power. Thus, the question becomes whether Cherry Hill Township, by enacting Ordinance 93–27, was legitimately exercising its police powers. With regard to the enactment, yes. With regard to the interpretation the district is giving it, no. Interestingly, the township has not taken a position in this case, even though it, through counsel, attended conferences and sat at counsel table during arguments on the motions. Who could best enlighten the court as to the purpose for which the ordinance was created, beyond what the resolution stated, than the author of the document?

The final question becomes whether the district, by attempting to abrogate existing leases, is appropriately exercising its limited police powers. This court concludes that it is not. The same geographical areas remain to be served, the same personnel will perform the service, the need for fire houses and equipment remains and the cost of the same must be carried by the taxpayers. In fact, the taxpayers in each district have already approved those sums necessary to protect their health and safety. The desire to possibly save the taxpayers money, which really does not relate to the health and safety question, is not a sufficient reason to abrogate existing contractual obligations, especially when the leases specifically state

> ... any governmental body, township, fire district or other political subdivision, or entity of any nature whatsoever succeeding to the duties, responsibilities and/or assets of tenant as a result of such change shall automatically assume and be bound by all the liabilities and obligations of Tenant hereunder which are then outstanding or which may accrue during the remaining term of this Lease.

[Lease Agreement, paragraph 32.]

## CONCLUSION

The proofs submitted to this court, as the undisputed facts of the case, do not support a conclusion that the abrogation of previously and validly executed leases is necessary for the protection of the health, safety and welfare of the public or constitute a

permissible exercise of any police power that the district may have. The fact that the district is performing a governmental function by managing the district does not alone give it the power to avoid the constitutional interdiction against impairment of contracts or frustrate their fulfillment. Where a successor municipal entity has been created and it thereafter maintains substantially all of its predecessors' responsibilities which cover the same geographical area, retains substantially the same personnel and receives all of the assets of the predecessor entities without any monetary value being paid for the same, the assertion that some economies may be attained if it is permitted to abrogate existing contractual obligations of the predecessor municipal entities is totally insufficient to prevent the interdiction of the State and Federal Constitutional mandates against the impairment of contractual obligations. It is also a woeful premise upon which to rely in order to avoid the long standing national and state policy which requires successor municipal entities to honor the debts of its predecessors.

Accordingly, the motions of the fire companies are granted and the motion of the District is denied.