877 A.2d 1258

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
CARL S. WILLIAMS, DEFENDANT–APPELLANT.

Argued March 15, 2005—Decided July 28, 2005.

*Gilbert G. Miller*, Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars*, Public Defender, attorney).

*Paul H. Heinzel*, Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey*, Attorney General of New Jersey, attorney).

*Robert E. Margulies* submitted a letter brief on behalf of amicus curiae Committee for Dispute Resolution (*Margulies, Wind & Herrington,* attorneys).

*Edwin J. McCreedy,* President, submitted a brief on behalf of amicus curiae New Jersey State Bar Association.

Justice ZAZZALI delivered the opinion of the Court.

In this appeal, we must decide whether a mediator appointed by a court under *Rule* 1:40 may testify in a subsequent criminal proceeding regarding a participant's statements made during mediation.

Defendant's brother-in-law phoned defendant and left several taunting messages, leading to a face-to-face argument that quickly escalated into a physical fight. Defendant claims that his brother-in-law hit him in the shoulder with a large construction shovel. The brother-in-law counters that defendant retrieved a machete from the trunk of his car and cut the brother-in-law's wrist and foot. Police later apprehended defendant in his apartment where they found a machete.

After his arrest, defendant filed a municipal court complaint against his brother-in-law, alleging that the phone messages constituted harassment. The municipal court, in accordance with *Rule* 1:40, appointed a mediator in an attempt to resolve the harassment dispute. The mediation was unsuccessful, and the mediator referred the matter back to municipal court.

A grand jury later indicted defendant for aggravated assault and two charges of possession of a weapon. Defendant asserted self-defense as his primary theory and proffered the mediator as a defense witness. Questioned by the court outside of the jury's presence, the mediator indicated that the brother-in-law stated during the mediation session that he had wielded the shovel. The court, however, excluded that testimony under *Rule* 1:40–4(c), which prohibits a mediator from testifying in any subsequent proceeding.

Defendant was convicted of assault and a weapons charge. The Appellate Division upheld the trial court's exclusion of the mediator's testimony and affirmed defendant's conviction. For the reasons set forth below, we agree with the Appellate Division and affirm.

## I.

Defendant Carl Williams and his brother-in-law, Brahima Bocoum, were close friends. Defendant's wife, Kia, is the sister of Bocoum's wife, Renee Oliver. Difficulties between defendant and Kia's family eventually destroyed his friendship with Bocoum. The situation worsened when Bocoum became enraged after Renee told him that defendant had been gossiping about him. Together with Renee and her brother Robert, Bocoum left threatening, profanity-laced messages on defendant's voicemail.

When defendant received the messages the next morning, he drove to Bocoum's residence. He called into Bocoum's house and banged on a window, waking Bocoum, Renee, and Robert. From a first-story window, Bocoum began arguing with defendant. Bocoum eventually went outside to confront defendant on his front porch. At one point, Robert pulled Bocoum back into the house, but Bocoum reemerged and approached defendant on the sidewalk.

According to Bocoum, defendant walked to his car parked across the street, opened the trunk, and pulled out a machete. Defendant swung the machete at Bocoum, cutting his right wrist. The two wrestled briefly and fell into several full garbage cans. Renee and Robert confirm Bocoum's accusations. Defendant, however, denies that he had a machete and claims that Bocoum cut his wrist when they fell into the garbage cans. Defendant further maintains that, at one point during the argument, Bocoum picked up a large construction shovel located on the front porch and hit defendant in the shoulder. Bocoum, Renee, and Robert all testified that Bocoum did not pick up or swing a shovel at defendant.

After crashing into the garbage, defendant got into his car and sped away. Police arrived at the scene and sent Bocoum to a hospital, where he received treatment for the cut on his wrist and was released. Police found the sheath to a machete on the sidewalk in front of Bocoum's residence. Officers went to defendant's apartment, but he did not answer when they knocked and announced their presence. A maintenance person opened the apartment door, and police entered and arrested defendant. Officers discovered an unsheathed machete under a bed in the apartment.

While in police custody, an officer advised defendant that he could file a municipal court complaint against Bocoum and Renee for making harassing phone calls. After defendant filed the complaint, the municipal court, pursuant to *Rule* 1:40, appointed Pastor Josiah Hall to mediate the dispute. The parties were unable to resolve their dispute through mediation, and Hall referred the matter back to the municipal court.

A grand jury indicted defendant for third-degree aggravated assault, *N.J.S.A.* 2C:12–1b(2); third-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4d; and fourth-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39–5d. At trial, Renee Oliver, who was testifying for the State, pointed out Hall, the mediator, who was seated in the audience section of the courtroom. At a recess, defense counsel spoke with Hall and then requested permission to call him as a defense witness. With the jury excused, the court interviewed Hall, who confirmed that he was the mediator who conducted the mediation between defendant and Bocoum more than a year earlier. He said that he attended the trial because defendant had stopped by his house and told him that the trial was scheduled to start. Although Hall denied being a "friend" of defendant, he indicated that he lived near defendant's mother, and, as a pastor, he was obligated "to be friendly with everybody."

Hall described defendant and Bocoum's exchange during the mediation:

They were talking about the fight that they has. [Defendant] says that they went into a fight and they come together and he picked up the next gentleman and he threw him and they fell into a garbage bin, okay? ... I ask [defendant] did you use a weapon and he says no.

The other fellow says that it was a fight and there was a shovel at the door and he picked up the shovel and—but he didn't make any hit with it.

Hall said that the mediation session quickly became chaotic, with both defendant and Bocoum "talking at the same time." According to Hall, Bocoum "said he's the one that picked up the shovel. It seemed like he picked up—to my understanding, the little knowledge I have—he picked up the shovel, but he didn't say he hit [defendant] with it or nothing." Hall also recalled that he "didn't hear nothing about a machete."

After interviewing Hall, the court rejected defendant's proffer of Hall's testimony. The court based its ruling on *Rule* 1:40–4(c), which guarantees the confidentiality of mediation sessions. The trial court stated:

There is very strong public policy for this rule. It really obliterates the whole dispute resolution process if this confidentiality is not enforced. Of course, the rule has been violated. The mediator violated it; [defense counsel] violated it.

I've made a record for a court. [Defense counsel] has no right to ask him about what went on in that mediation process in the first place, to solicit that information from him. And the question I'm faced with now that the rule has been violated, should I under all of the circumstances allow the defendant the benefit of this testimony.

I'm not satisfied that it's terribly valuable; but certainly the argument could—may be made on the other side it has great value to him and the jury should be allowed to decide. But my inclination is—I guess it becomes a personal posture—that I think rules should be followed, especially when there's good reasons for the rule. And because someone else has already violated the rule, that doesn't mean the court should now disregard the rule. That would be a solicitation for rules not to be followed in the future.

So—an appellate division may think otherwise. But my view of this matter is that ... there was a rule that provides for confidentiality and that that rule should be followed and the defendant cannot be allowed this witness at this trial.

... I have personally very serious reservations about the reliability of his testimony, but I'm not deciding this based on that. I'm deciding it based on the fact that whatever was said in that mediation process was said after the people were told it was confidential and wouldn't be used in a criminal proceeding thereafter. And while it has some probative value to the defendant, I'm persuaded on balance that I would follow the rule and not encourage rules to be violated. So I won't allow him to testify.

The jury convicted defendant of third-degree aggravated assault and fourth-degree possession of a weapon. Defendant was acquitted of a third-degree weapons charge. The trial court sentenced defendant to three years probation, imposed $1,162 in fines and court costs, and required defendant to complete anger management counseling and community service.

After defendant appealed, the Appellate Division affirmed his conviction in an unreported decision. The court acknowledged that Hall's testimony potentially could have helped defendant establish self-defense, "a key defense contention." However, the panel ultimately agreed with the trial court's refusal to admit Hall as a witness, concluding that defendant was not deprived of a fair trial because the panel found that his assertion of self-defense "was fully tried to the jury." Accordingly, the court held that "[t]he interests of justice do not require relaxation of [*Rule* ] 1:40–4(c) under the circumstances of this case."

We granted defendant's petition for certification solely on the issue of the admissibility of the mediator's testimony. 182 *N.J.* 426, 866 *A.*2d 983 (2004). We also granted amicus curiae status to the New Jersey State Bar Association (NJSBA) and to the Committee on Dispute Resolution (Committee), which is an "association of mediation and arbitration experts."

## II.

Defendant contends that the mediator's testimony may serve to exculpate him and that the trial court's refusal to allow the mediator to testify deprived him of his right to fully present a defense. Defendant explains that his defense depends on whether he can establish that he acted in self-defense. He maintains that "[t]he relevance and probative value of Pastor Hall's proffered testimony was clear and substantial, as it would have established, from an unbiased witness, that Bocoum indeed wielded a shovel during the fight." Defendant insists that his right to compulsory process was violated when he was unable to proffer the mediator's testimony as substantive evidence that Bocoum had the shovel and

to boost defendant's own credibility as a prior consistent statement. Defendant further argues that the trial court's ruling interfered with his ability to impeach the credibility of the State's witnesses regarding their testimony that Bocoum did not charge at defendant with the shovel. Accordingly, defendant urges this Court to relax *Rule* 1:40–4(c) to allow the mediator to testify on remand.

The State opposes relaxation of *Rule* 1:40–4(c). Although the State acknowledges defendant's right to present a complete defense, it argues that that right is not unfettered and that "trial courts may impose reasonable limits upon defense counsel." The State maintains that defendant has not presented compelling reasons for introducing Hall's testimony and, therefore, the trial court's decision was not erroneous.

### III.

Before addressing the central issue in this appeal—whether, and under what circumstances, a mediator's testimony may be excluded from a criminal trial—we first set forth the background of the mediator's privilege and the rights that defendant claims are impaired by that privilege.

### A.

Bocoum made statements, which defendant alleges are exculpatory, during a mediation session that the municipal court ordered as part of the Complementary Dispute Resolution Programs (CDR), *Rule* 1:40. CDR features procedures that either encourage settlement, narrow issues for adjudication, or both. *Rule* 1:40–1 describes those procedures as "an integral part of the judicial process, intended to enhance its quality and efficacy." Among the various CDR alternatives, a court may order the parties to participate in mediation, during which a neutral person "facilitates communication between parties in an effort to promote settlement without imposition of the mediator's own judgment regarding the issues in dispute." *R.* 1:40–2(c).

442

■ *Rule* 1:40–4(c) governs the confidentiality of statements made during mediation:

> [N]o disclosure made by a party during mediation shall be admitted as evidence against that party in any civil, criminal, or quasi-criminal proceeding.... *No mediator may participate in any subsequent hearing or trial of the mediated matter or appear as witness or counsel for any person in the same or any related matter.*
>
> [ (Emphasis added.) ]

In this matter, the mediator's act of testifying constitutes an "appear[ance] as [a] witness." *See ibid.* And, although defendant's municipal court proceeding dealt primarily with the allegedly harassing phone messages from Bocoum that precipitated the fight, the municipal action also is a "matter" that is "related" to defendant's "subsequent ... trial" for assault and weapons charges. *See ibid.* Therefore, under a plain reading of *Rule* 1:40–4(c), the trial court correctly prevented the jury from hearing the mediator's testimony.

Defendant asks this Court to relax the *Rule* 1:40–4(c) prohibition of mediator testimony under *Rule* 1:1–2, which provides that court rules "shall be construed to secure a just determination ... [and] fairness in administration." Unless a rule specifically disallows relaxation, it "may be relaxed or dispensed with by the court in which the action is pending if adherence to it would result in an injustice." *Ibid.* The CDR rules allow relaxation or modification if an "injustice or inequity would otherwise result." *R.* 1:40–10.

■ Justice Clifford's dissent in *Stone v. Township of Old Bridge* captures the spirit that animates *Rule* 1:1–2: "Our Rules of procedure are not simply a minuet scored for lawyers to prance through on pain of losing the dance contest should they trip." 111 *N.J.* 110, 125, 543 *A.*2d 431 (1988) (Clifford, J., dissenting). Case law and common sense, however, demonstrate that *Rule* 1:1–2 is the exception, rather than the norm. *See* Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 1:1–2 (2005) ("[R]ecourse to the relaxation provision ... should be sparing.") (citing *Oliviero v. Porter Hayden Co.,* 241 *N.J.Super.* 381, 387, 575 *A.*2d 50 (App.Div. 1990); *Ricci v. Corp. Exp. of E.,* 344 *N.J.Super.* 39, 47–48, 779

A.2d 1114 (App.Div.2001), *certif. denied,* 171 *N.J.* 42, 791 *A.2d* 220 (2002); *Stewart Title Guar. Co. v. Lewis,* 347 *N.J.Super.* 127, 137–38, 788 *A.2d* 941 (Ch.Div.2001)).

## B.

Determining whether relaxation is appropriate in this appeal requires an examination and balancing of the interests that are at stake. The Fourteenth Amendment guarantees every criminal defendant the right to a fair trial. *Strickland v. Washington,* 466 *U.S.* 668, 684–685, 104 *S.Ct.* 2052, 2063, 80 *L.Ed.2d* 674, 691–92 (1984). At its core, that guarantee requires a "fair opportunity to defend against the State's accusations." *Chambers v. Mississippi,* 410 *U.S.* 284, 294, 93 *S.Ct.* 1038, 1045, 35 *L.Ed.2d* 297, 308 (1973). The Supreme Court has explained that this right is effectuated "largely through the several provisions of the Sixth Amendment," *Strickland, supra,* 466 *U.S.* at 685, 104 *S.Ct.* at 2063, 80 *L.Ed.2d* at 691, which entitles a defendant "to be confronted with the witnesses against him" and "to have compulsory process" to secure testimonial and other evidence. Our State Constitution, containing identical wording, affords those same rights. *N.J. Const.* art. I, ¶ 10; *State v. Garron,* 177 *N.J.* 147, 168–69, 827 *A.2d* 243 (2003).

The confrontation right assures a defendant the opportunity to cross-examine and impeach the State's witnesses. *See Davis v. Alaska,* 415 *U.S.* 308, 315–16, 94 *S.Ct.* 1105, 1110, 39 *L.Ed.2d* 347, 353 (1974). "The right to confront and cross-examine accusing witnesses is among the minimum essentials of a fair trial." *State v. Budis,* 125 *N.J.* 519, 531, 593 *A.2d* 784 (1991) (internal quotation marks omitted). The right to compulsory process is grounded in similar sentiments: "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *State v. Sanchez,* 143 *N.J.* 273, 290, 670 *A.2d* 535 (1996) (internal quotation marks omitted). Together, the rights of confrontation and compulsory process guarantee "a meaningful opportunity to present a complete defense." *Crane v. Kentucky,*

476 *U.S.* 683, 690, 106 *S.Ct.* 2142, 2146, 90 *L.Ed.*2d 636, 645 (1986) (internal quotation marks omitted). "That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on ... credibility ... when such evidence is central to the defendant's claim of innocence." *Garron, supra,* 177 *N.J.* at 168, 827 *A.*2d 243 (quoting *Crane, supra,* 476 *U.S.* at 690, 106 *S.Ct.* at 2147, 90 *L.Ed.*2d at 645).

But the rights to confront State witnesses and to present favorable witnesses are "not absolute, and may, in appropriate circumstances, bow to competing interests." *Budis, supra,* 125 *N.J.* at 531, 593 *A.*2d 784. Generally, courts conducting criminal trials may reject proffers of "evidence helpful to the defense if exclusion serves the interests of fairness and reliability." *Id.* at 531–32, 593 *A.*2d 784. For example, because assertions of privilege often " 'undermine the search for truth in the administration of justice,' they are accepted only to the extent that they outweigh the public interest in the search for truth." *State v. Szemple,* 135 *N.J.* 406, 413–14, 640 *A.*2d 817 (1994) (quoting *State v. Dyal,* 97 *N.J.* 229, 237, 478 *A.*2d 390, (1984)). Thus, "if evidence is relevant and necessary to a fair determination of the issues, the admission of the evidence is constitutionally compelled." *Garron, supra,* 177 *N.J.* at 171, 827 *A.*2d 243.

## IV.

With that law as a backdrop, we now must determine whether the trial court's exclusion of the mediator's testimony under *Rule* 1:40–4(c) was constitutionally permissible.

The recently enacted Uniform Mediation Act (UMA), *N.J.S.A.* 2A:23C–1 to –13, was not in effect when the trial court excluded mediator testimony in this matter. However, two amici, the Committee and the NJSBA, urge this Court to apply the principles expressed in the UMA when determining whether to allow mediator testimony in criminal matters because the statute "is much more finely tuned and precise than [*Rule* ] 1:40–4(c)." We agree that the UMA principles, in general, are an appropriate

analytical framework for the determination whether defendant can overcome the mediator's privilege not to testify.

The UMA protects mediation confidentiality by empowering disputants, mediators, and nonparty participants to "refuse to disclose, and [to] prevent any other person from disclosing, a mediation communication." *N.J.S.A.* 2A:23C–4b. The privilege yields, however, if a court determines "that the mediation communication is sought or offered in" a criminal proceeding, "that there is a need for the evidence that substantially outweighs the interest in protecting confidentiality," and "that the proponent of the evidence has shown that the evidence is not otherwise available." *N.J.S.A.* 2A:23C–6b. The burden is on defendant to satisfy these requirements, and he can only prevail if he meets each condition. *See* Nat'l Conference of Comm'rs of Unif. State Laws, *Uniform Mediation Act* § 6 cmt. 9 (2001), *available at* www.law.upenn.edu /bll/ulc/mediat/ UMA2001.htm [hereinafter *UMA Drafters' Statement* ] (explaining that UMA "effectively places the burden the proponent to persuade the court on these points").

As noted, the UMA states that the privilege gives way if the need for the evidence "substantially outweighs" the interest in protecting confidentiality. Defendant asserts, and the State disagrees, that the qualifier "substantially" represents an unconstitutional evidentiary restriction. Defendant adds that the Court should consider only whether the need "outweighs" the confidentiality interests, a standard that is less burdensome for defendant.

We do not determine the constitutionality of the UMA standard in this appeal for three reasons. First, as noted above, the UMA was not in effect when the events at issue in this trial occurred. Second, the parties raised the issue for the first time after oral argument before the Court in this matter. It is appropriate that we defer consideration until litigants can fully argue and brief the subject in a proper case. Third, we need not address that question now because its resolution is not necessary to our disposition. That is so because even when we apply defendant's stan-

dard, the mediator's testimony does not outweigh—let alone substantially outweigh—the interest in protecting confidentiality.

The first requirement is clearly satisfied because defendant is on trial for assault and weapons charges and seeks to introduce evidence of mediation statements into that trial. Therefore, we must assess whether the interest in maintaining mediation confidentiality is outweighed by the defendant's need for the mediator's testimony. Finally, we consider whether the substance of the testimony is available from other sources. Ultimately, we conclude that defendant has not met those requirements and, therefore, cannot defeat the privilege against mediator testimony.

### A.

We begin by considering the "interest in protecting confidentiality" and examining the social and legal significance of mediation. An integral part of the increasingly prevalent practice of alternative dispute resolution (ADR), mediation is designed to encourage parties to reach compromise and settlement. *See R.* 1:40–3(c) (describing mediation as "a process by which a mediator facilitates communication between parties in an effort to promote settlement"); Michael L. Prigoff, *Toward Candor or Chaos: The Case of Confidentiality in Mediation,* 12 *Seton Hall Legis. J.* 1, 12 (1988) (stating that "[t]he trend towards compromise and settlement of disputes, which mediation advances, is clear"). Courts have long-recognized that public policy favors settlement of legal disputes, *see, e.g., Nolan ex rel. Nolan v. Lee Ho,* 120 *N.J.* 465, 472, 577 *A.*2d 143 (1990), and that confidentiality is a "fundamental ingredient of the settlement process," *Brown v. Pica,* 360 *N.J.Super.* 565, 568, 823 *A.*2d 899 (Law Div.2001). The rationale is simple: "If settlement offers were to be treated as admissions of liability, many of them might never be made." Biunno, *Current N.J. Rules of Evidence,* comment 1 on *N.J.R.E.* 408 (2004) (citing 2 *McCormick on Evidence* § 266 (4th ed.1992)); *accord Brown, supra,* 360 *N.J.Super.* at 569, 823 *A.*2d 899 (observing that confi-

dentiality "aids in the free and frank discussion" during settlement negotiations).

Successful mediation, with its emphasis on conciliation, depends on confidentiality perhaps more than any other form of ADR. *See Foxgate Homeowners' Ass'n, Inc. v. Bramalea Cal., Inc.,* 26 *Cal.*4th 1, 108 *Cal.Rptr.*2d 642, 25 *P.*3d 1117, 1126 (2001) ("[C]onfidentiality is essential to effective mediation. . . ."). Confidentiality allows "the parties participating [to] feel that they may be open and honest among themselves. . . . Without such assurances, disputants may be unwilling to reveal relevant information and may be hesitant to disclose potential accommodations that might appear to compromise the positions they have taken." *Final Report of the Supreme Court Task Force on Dispute Resolution* 23 (1990); *see also* Prigoff, *supra,* 12 *Seton Hall Legis. J.* at 2 ("Compromise negotiations often require the admission of facts which disputants would never otherwise concede."). Indeed, mediation stands in stark contrast to formal adjudication, and even arbitration, in which the avowed goal is to uncover and present evidence of claims and defenses in an adversarial setting. Mediation sessions, on the other hand, "are not conducted under oath, do not follow traditional rules of evidence, and are not limited to developing the facts." *Rinaker v. Superior Court,* 62 *Cal.App.*4th 155, 74 *Cal.Rptr.*2d 464, 467 (1998). Mediation communications, which "would not [even] exist but for the settlement attempt," are made by parties "without the expectation that they will later be bound by them." Prigoff, *supra,* 12 *Seton Hall Legis. J.* at 2, 13. Ultimately, allowing participants to treat mediation as a fact-finding expedition would sabotage its effectiveness. *See id.* at 2 (warning that routine breaches of confidentiality would reduce mediation to "discovery device").

If mediation confidentiality is important, the appearance of mediator impartiality is imperative. A mediator, although neutral, often takes an active role in promoting candid dialogue "by identifying issues [and] encouraging parties to accommodate each others' interests." *Id.* at 2. To perform that function, a mediator

must be able "to instill the trust and confidence of the participants in the mediation process. That confidence is insured if the participants trust that information conveyed to the mediator will remain in confidence. Neutrality is the essence of the mediation process." *Isaacson v. Isaacson,* 348 *N.J.Super.* 560, 575, 792 *A.*2d 525 (App.Div.2002) (interpreting *Rule* 1:40). Thus, courts should be especially wary of mediator testimony because "no matter how carefully presented, *[it] will inevitably be characterized so as to favor one side or the other.*" Prigoff, *supra,* 12 *Seton Hall Legis. J.* at 2 (emphasis added); *see also In re Anonymous,* 283 *F.*3d 627, 640 (4th Cir.2002) ("If [mediators] were permitted or required to testify about their activities, ... not even the strictest adherence to purely factual matters would prevent the evidence from favoring or seeming to favor one side or the other." (alteration in original) (quoting *NLRB v. Joseph Macaluso, Inc.,* 618 *F.*2d 51 (9th Cir.1980))); Ellen Deason, *The Quest for Uniformity in Mediation Confidentiality: Foolish Consistency or Crucial Predictability?,* 85 *Marq. L.Rev.* 79, 82 (2001) ("[I]f a mediator can be converted into the opposing party's weapon in court, then her neutrality is only temporary and illusory.").

There is a growing body of evidence that mediation is particularly successful at facilitating settlement. *See UMA Drafters' Statement, supra,* prefatory n. 2 ("[D]isputing parties often reach settlement earlier through mediation, because of the expression of emotions and exchanges of information that occur as part of the mediation process."). A recent study of a court-mandated mediation program in New Jersey found that nearly 40% of matters diverted to mediation were resolved at the mediation or within three months afterward, most "with little or no discovery" and the concomitant expense to disputants. *Report of the Committee on Complementary Dispute Resolution on the Evaluation of the Presumptive Mediation Pilot Program 2000–2004,* at 1 (2005) [hereinafter *Pilot Program Report*]. Further, although some litigants who settle an acrimonious lawsuit may feel as though they have achieved nothing more than an "equitable distribution of dissatisfaction," Rabb Emison, *A Meditation on Mediation—*

*Revisited,* 44 *Res Gestae* 46, 46 (2001), mediation's great strength is that disputants who settle in that forum are generally satisfied with the process and the result, *see Pilot Program Report, supra,* at 1 ("Both mediators' performance and the process itself were rated exceedingly high by both litigants and attorneys responding to post-mediation exit questionnaires.").

Defendant argues that the admission of the mediator's testimony would not "obliterate the whole dispute resolution process" because "[t]he only prejudice posed by Pastor Hall's testimony ... was inconvenience to the mediator and the municipal court. Such inconvenience was relatively insignificant." According to defendant, mediation participants cannot reasonably expect their assertions to be confidential because *Rule* 1:40–4(c) allows the admission of statements of a mediation participant if that participant is not a party to the later proceeding where admission is sought. Defendant contends that, as a non-party to this matter, Bocoum has no interest in defendant's prosecution and, therefore, no reason to complain about the manner in which his statements are used.

Defendant's position trivializes the harm that will result if parties are routinely able to obtain compulsory process over mediators. Simply because the mediator does not actually testify *against* the victim (who is, by definition, a non-party to a State criminal prosecution) does not mean that the victim is unaffected by the prospect that his statements, made with assurances of confidentiality, will be used to exculpate the person who victimized him. In such circumstances, the victim could hardly be expected to trust that the mediator was impartial.

Numerous expressions of New Jersey policy reinforce the notion that statements made during dispute resolution proceedings should remain confidential. For example, under the New Jersey Rules of Evidence, statements made by parties during settlement negotiations are generally inadmissible in subsequent proceedings, *N.J.R.E.* 408, as are most statements made during criminal plea negotiations, *N.J.R.E.* 410. Similarly, the New Jersey Alternative

Procedure for Dispute Resolution Act, *N.J.S.A.* 2A:23A–1 to –19, strictly limits the ability of ADR participants to introduce statements at subsequent proceedings or to call an arbitrator as a witness. *See N.J.S.A.* 2A:23A–9(c) (rendering arbitrator "not competent to testify in any subsequent proceeding"); *N.J.S.A.* 2A:23A–20 (providing that statements made during arbitration are inadmissible for any purpose at subsequent trial de novo). *Rule* 4:21A–4(e), which applies to certain court-mandated arbitrations, similarly excludes the use of prior statements made during arbitration in a trial de novo and bars the arbitrator from being "called as a witness in any such subsequent trial."

### B.

 Because there is a substantial interest in protecting mediation confidentiality, we must consider defendant's need for the mediator's testimony. To ascertain whether that testimony is "necessary to prove" self-defense, we assess its "nature and quality." *See Garron, supra,* 177 *N.J.* at 165, 172–73, 827 *A.*2d 243.

The mediator's testimony in this matter does not exhibit the indicia of reliability and trustworthiness demanded of competent evidence. *See State v. P.H.,* 178 *N.J.* 378, 389, 840 *A.*2d 808 (2004); *United States v. Scheffer,* 523 *U.S.* 303, 309, 118 *S.Ct.* 1261, 1265, 140 *L.Ed.*2d 413, 419 (1998) (State "unquestionably [has] a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial."). Indeed, the mediator's description of the session gives the overall impression of bedlam, making it difficult to accurately attribute specific statements to individual speakers. For instance, the mediator explained that the mediation participants "started to raise their voices," and all the parties were "talking at the same time." The mediator was forced to tell the participants to speak "only one person at a time," but once a question was asked, "both of them start[ed]." During this exchange, the mediator recalled, "[o]ne is saying I picked you up and I threw you; the other one said there was a shovel, I picked

up the shovel." When pressed by the trial court, the mediator identified Bocoum as the one who said he had the shovel, at least "to [his] understanding, the little knowledge" he had. Moreover, all of these statements were made after the mediator explicitly informed the parties that "[t]he mediation room is confidential," and no transcript or recording was made.

There are other indications that suggest that the mediator's testimony is not trustworthy. For example, although the mediator insisted that he and defendant were not "friend[s]," the mediator's appearance in the courtroom raises questions concerning his neutrality. The mediator, who lives on the same street as defendant's mother, attended the trial after defendant stopped by his house and informed him that the trial was about to begin. Then, defense counsel conferred with the mediator outside the courtroom, elicited his recollection of the mediation, and asked him to testify.

Furthermore, the mediator's testimony does not corroborate defendant's version of what transpired during the fight. Defendant testified that Bocoum hit him in the shoulder with the shovel, entitling defendant to defend himself. The mediator, however, testified that Bocoum said he "picked up the shovel ... but he didn't make any hit with it." Thus, even on the basic point of whether Bocoum hit defendant, the probative value of the mediator's testimony is diminished because it does not substantiate defendant's contention.[1]

Finally, by asking the mediator to divulge the disputants' statements made during mediation, the defense induced the mediator's breach of confidentiality without first seeking the court's permis-

---

[1] The dissent suggests that the portions of the mediator's testimony that appear in the majority opinion "do not fully reflect the entire colloquy." *Post* at 456, 877 A.2d at 1271. Although the dissenting opinion provides lengthy excerpts, that additional testimony does little more than emphasize that the mediator claims to remember Bocoum saying he wielded the shovel. Even in its entirety, however, the mediator's testimony does not corroborate—and, in fact, contradicts—defendant's essential contention that Bocoum hit him with the shovel.

sion. Defendant now seeks to benefit from that breach. Condoning such behavior would encourage all similarly situated defendants to do likewise. As the trial court explained: "[B]ecause someone else has already violated the rule [ (i.e., defense counsel) ], that doesn't mean the court should now disregard the rule. That would be solicitation for rules not to be followed." Moreover, the defense failed to comply with evidence rules designed to ensure that only reliable impeachment evidence is put before the jury in a manner that is fair to both parties. For instance, *N.J.R.E.* 613(b) and 803(a)(1) generally require that a party seeking to impeach a witness with a prior inconsistent statement afford that witness "an opportunity to explain or deny the statement." *N.J.R.E.* 613(b). Here, defense counsel did not allow Bocoum to explain the mediator's account of his statements.

In sum, the mediator's testimony was not sufficiently probative to strengthen defendant's assertion of self-defense. In light of the importance of preserving the role of mediation as a forum for dispute resolution, we conclude that defendant's need for the mediator's testimony does not outweigh the interest in protecting mediation confidentiality.

### C.

Apart from whether the need for the mediator's testimony outweighed the interest in confidentiality, we also consider whether defendant failed to demonstrate that evidence of Bocoum's use of the shovel was "not otherwise available." *N.J.S.A.* 2A:23C–6b.

Both parties had access to, and presented at trial, substantial evidence from other sources bearing on the issue of self-defense. Although three state eyewitnesses testified that Bocoum did not have the shovel, defense counsel thoroughly cross-examined them in an effort to discredit that testimony. Further, Kia Williams, defendant's wife, testified that her brother Robert confessed to her that he had lied during his testimony and that Bocoum had, in fact, wielded the shovel. Finally, testifying on his own behalf, defendant related his version of the fight and accused Bocoum of

attacking him with a "long construction shovel": "[H]e take up the shovel ... and he hit me on the shoulder." At that point, according to defendant, he and Bocoum began wrestling, causing Bocoum to drop the shovel. As defendant was preparing to leave, "Bocoum grabbed the shovel from [Robert] and run ... across the street.... [H]e come towards to hit my car." The jury also was presented with excerpts from defendant's written statement to the police, in which he claimed that Bocoum "came out with a big, long shovel in his hand ... and he swing at me with the shovel." Accordingly, we conclude that defendant failed to demonstrate that evidence concerning Bocoum's use of the shovel was otherwise unavailable.

 We note that defendant's own trial testimony recounted Bocoum's mediation statements about the shovel. Under the UMA, there is a serious question, however, whether defendant should have been allowed to testify at all regarding Bocoum's mediation communications. The UMA's confidentiality provision applies with equal force to a mediation participant, such as defendant, as it does to the mediator. *See N.J.S.A.* 2A:23C–4b. Nonetheless, the parties have not raised that issue before us, and we decline to address it further.

That said, in an exchange with defense counsel at trial, defendant testified as follows:

Q. Okay. I asked you what did Brahima Bocoum say [at the mediation].... What did Brahima Bocoum say happened?

A. Yeah. I told him he have a shovel. He said yes, he have the shovel.

Q. You heard Brahima Bocoum say he had a shovel?

A. Yeah.

Therefore, in this matter, the jury heard evidence of Bocoum's purported inconsistent statement.

### D.

 Defendant had the opportunity to present substantial evidence, including his own testimony regarding mediation communications, to support his assertion of self-defense and to cross-

examine Bocoum. Thus, defendant received that which the Confrontation Clause guarantees: "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 *U.S.* 15, 20, 106 *S.Ct.* 292, 294, 88 *L.Ed.2d* 15, 19 (1985) (emphasis omitted).

## V.

Ultimately, the trial court's rejection of defendant's proffer of the mediator's testimony rested upon the sound policy justifications underlying mediation confidentiality. Accordingly, we affirm the Appellate Division because defendant has not made the requisite showings to overcome the mediation privilege in this matter. Defendant's need for the mediator's testimony does not outweigh the interest in mediation confidentiality, and defendant has failed to show that the evidence was not otherwise available.

LONG, J., Dissenting.

The majority has essentially applied the rule we enunciated in *State v. Garron*, 177 *N.J.* 147, 171–72, 827 *A.2d* 243 (2003)—that where evidence is relevant and necessary to the defense of a criminal case, and cannot be otherwise obtained, it will not be shielded by a privilege. That is the proper paradigm for this case.

However, I disagree with the Court's conclusions regarding the "need" for the mediator's testimony and whether it was "otherwise available" within the meaning of *N.J.S.A.* 2A:23C–6(b). Obviously, those are fact-sensitive conclusions. However, the facts in this case do not support them. This case was a pitched credibility battle over whether defendant acted in self-defense when confronted by Bocoum, wielding a shovel against him. Defendant testified that Bocoum had a shovel. Bocoum testified that he did not. All of the other witnesses were partisans of defendant or Bocoum, related by blood or marriage. Renee Oliver, Bocoum's wife, and her brother, Robert Eckford, supported Bocoum's position that he never picked up or swung a shovel at defendant. Kia

Williams, defendant's wife and the sister of Renee and Robert, testified that Robert admitted to her on more than one occasion that Bocoum did wield a shovel and that he had lied in his testimony.

Defendant, the most interested of all witnesses, testified that Bocoum admitted during mediation that he had a shovel. If Bocoum made that admission, it was in direct conflict with his trial testimony and dramatically undercut his credibility on the fundamental issue in the case: self-defense. I disagree with the majority's conclusion that defense evidence on the subject obviated the need for the mediator's testimony.

The mediator's position as the only objective witness placed him in an entirely distinct role from the other witnesses in the case. *See Model Jury Charge (Criminal)*, "Credibility of Witnesses," (2002) (stating jury, "in determining whether a witness is ... credible," "may take into consideration ... the possible bias, if any, in favor of the side for whom the witness testified"). The evidence that the mediator could have given was therefore different in kind from that of defendant. *See Corkery v. Central R.R. of New Jersey*, 43 A. 655, 655 (N.J.Sup.Ct.1899) (holding evidence "of a different kind and character" to be "not cumulative"); *Van Riper v. Dundee Mfg. Co.*, 33 *N.J.L.* 152, 156 (Sup.Ct.1868) (defining cumulative evidence as "additional evidence to support the same point, and which is of the same character as evidence already produced") (internal citations and quotation marks omitted). Because the mediator was the only witness without a proverbial "ax to grind," his testimony was not "otherwise available," nor was it cumulative. Indeed, it could have turned the tide in this very close case. Therefore, it was essential both to the defense of the criminal charges against defendant and to the very fairness of the trial. That was a sufficient basis on which to breach the mediator's privilege.

Finally, I believe that this Court overstepped its bounds in declaring that the mediator's testimony "does not exhibit the indicia of reliability and trustworthiness demanded of competent

evidence." [1] In support of its conclusion, the majority has excerpted portions of the mediator's testimony that, to me, do not fully reflect the entire colloquy. The complete transcript of the mediator's testimony leaves a different impression than those excerpts:

Mediator: They were talking about the fight that they has. Carl [Williams] says that they went into a fight and they come together and he picked up the next gentleman and he threw him and they fell into a garbage bin, okay? He says—and I ask him did you use a weapon and he says no.

*The other fellow says that it was a fight and there was a shovel at the door and he picked up the shovel and—but he didn't make any hit with it.* The wife says that she threw her shoes at Carl.

They started to raise their voices. I says you know what? My part of this court is, if I started to ask questions, only one person at a time. And both of them start. I says okay, listen, let me—case closed. And I send it back to the judge.

Trial Judge: So you weren't able to get an account given by any one of them sitting down talking without other people talking at the same time?

Mediator: Both of them was talking at the same time. One is saying I picked you up and threw you; *the other one said there was a shovel, I picked up the shovel.* And they were talking, going on. I says let the case close, send it back for trial. Because I'm only there to settle the cases.

If I get settled, then I wrote it up, wrote a statement up, and I signed it; then both parties sign it and the judge signs it. They both get a copy and they go home, settled. If I doesn't settle it, then I send it back.

Trial Judge: Did you have any contact with any of them between the time you mediated it and last Friday?

Mediator: No. I don't even know the people here, if I saw them right now, the people might come in, I wouldn't even know them, 'cause I only—Carl, I met him the first time in court.

Trial Judge: Then you didn't see him again until last Friday?

Mediator: To be frank, I saw him before Friday, but we didn't have no contact with nothing like this case.

Trial Judge: *Oh. Well, are you able to remember today who said that the one fellow had a shovel, whether Carl said he had a shovel or the guy said—*

Mediator: *The guy says he has a shovel; he picked up the shovel; it was some place at the door.*

Trial Judge: *It wasn't Carl that said the guy picked up the shovel?*

Mediator: *No. The next guy—I don't know his name; I don't remember his name—he said he's the one that picked up the shovel. It seemed like he picked*

---

[1] Although the trial judge expressed some reservations about the mediator's proposed testimony, he specifically declined to rule on that basis.

*up—to my understanding, the little knowledge that I have—he picked up the shovel, but he didn't say he hit Carl with it or nothing. And they both started to wrestle.*

[Emphasis added.]

There is nothing unclear about that testimony. Plainly, Bocoum admitted, in the mediator's presence, to wielding a shovel. That, in turn, rendered the mediator's testimony "relevant and necessary" to the defense. Any further concerns over the mediator's quality as a witness (e.g., ability to recollect or bias) went to the weight to be accorded to his testimony by the jury, not its admissibility. For all those reasons, I dissent.

Justice ALBIN joins in this opinion.

*For affirmance*—Chief Justice PORITZ and Justices LaVECCHIA, ZAZZALI, WALLACE and RIVERA–SOTO—5.

*For reversal and remandment*—Justices LONG and ALBIN— 2.